IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| DEVONDRIC SMITH, § | |
| § | |
| Petitioner, § | |
| § | |
| v. § | Civil Action No. 4:14-CV-062-O |
| § | |
| WILLIAM STEPHENS, Director, § | |
| Texas Department of Criminal Justice, § | |
| Correctional Institutions Division, § | |
| § | |
| Respondent. § | |

## OPINION AND ORDER

Before the Court is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by Petitioner, Devondric Smith, a state prisoner confined in the Correctional Institutions Division of the Texas Department of Criminal Justice (TDCJ), against William Stephens, Director of TDCJ, Respondent. After considering the pleadings and relief sought by Petitioner, the Court has concluded that the petition should be denied.

**I. BACKGROUND**

Petitioner was indicted in Tarrant County, Texas, with aggravated assault with a deadly weapon in the armed robbery of Charles Williams in the parking lot of a Family Dollar store in Fort Worth on or about December 28, 2005. Adm. R., WR-79-775-01 writ, 119, ECF No. 16-1. The indictment also included a repeat-offender notice. *Id.* The state appellate court summarized the facts of the case as follows:

> On December 28, 2005 at around 5 p.m., Charles Williams drove his black Suburban to the Family Dollar store on Miller Street to get a teething ring for his daughter and a lunch pail for work. As he exited the store, he saw two black males sitting in a white Honda Accord parked next to his Suburban on the driver's side. Williams opened the driver's door to his vehicle and both men in the Honda got out.

The man who had been seated in the passenger seat pointed a handgun in Williams' side and told him to "get in, don't make things badder than what it is, ain't nothing but a carjacking." Williams got in and slid over to the front passenger seat when the man told him to "get over," accidentally dropping his keys between the seat and console. Williams later identified James Adams from a photo lineup as the first gunman. A gold Nissan pulled up right behind his Suburban. A second gunman got out of the Nissan and entered the Suburban through the right rear passenger door and pointed at Williams what he described as an assault rifle, like an "AK or something" with a folding stock. Adams demanded that Williams give him all of his money and he gave them the $200 he had in his pocket. Adams also demanded the keys to the Suburban but Williams told him he did not have the keys. The second assailant told Adams, "we got the money, come on, let's go." Adams and the second man then exited the Suburban. Williams heard gunfire and he thought they had shot at him. He saw Adams get in the white Honda and the second assailant got in the gold Nissan. After the robbers left, Williams went into the Family Dollar Store and began telling people he had been robbed.

Tommy Miller, the store manager, went to the front of the store and saw someone who appeared to be panicked, yelling and saying, "Oh my God, oh my God." Initially Miller could not tell what had happened, but someone else said the man had been robbed. Miller called 9-1-1 and tried to tell the operator what had happened, but he was unable to get any information from Williams because of his emotional state. Williams left the store before the police arrived. At trial, Williams explained that he left because he was on felony probation for possession or manufacture of a controlled substance and did not want to talk with the police. After Williams left, Miller discovered a large pool of blood in the parking lot in front of the store.

Officer D.L. Blue of the Fort Worth Police Department received a call about a large amount of blood in the parking lot at the Family Dollar Store. Suspecting that someone had been shot, she began checking with local hospitals. She learned that James Adams was at Baylor City View Hospital with a gunshot wound in the left thigh. That hospital is about 20 to 25 minutes from the Family Dollar Store on Miller. Adams subsequently died as a result of the injury. Officer Lori Scheiern, a crime scene investigator, examined the blood in the parking lot at the Family Dollar Store. She found a blood trail leading away from the blood pool in the parking lot. Based on the elongated appearance of the blood drops, Scheiern determinated that the injured person was traveling at a high rate of speed through the parking lot away from the front of the store and toward the street. Scheiern could not state precisely how fast the injured person was moving but it was certainly faster than walking.

Later that evening, the police notified Adams' mother that her son had died from a gunshot wound. Adams had hung out with two brothers she knew only as "C"

2

and "D."  After learning of her son's death, Ms. Adams notified several of his friends, including "C" and "D."  "C" told Ms. Adams two stories about how her son was shot.  First, he said that he and James had gone to Miller Street to rob somebody but they had changed their minds.  He also said that James shot himself in the leg as they were running to the car and that he had taken James to the hospital.  "C" also told Ms. Adams that he and some of his friends were wrestling and the gun went off.  Ms. Adams called Sgt. Cheryl Johnson and reported what "C" had told her.  Another officer knew that Appellant was known as "C" and his brother, Kenard Smith, was known as "D."  Sgt. Johnson prepared photo lineups which included the photographs of Appellant and Kenard Smith and showed them to Ms. Adams.  Ms. Adams identified Appellant as "C" and Kenard Smith as "D."  At trial, Ms. Adams identified Appellant as the person she knew as "C."

Williams did not originally plan on speaking to the police about the robbery but he changed his mind after he learned that someone had died.  Two days after the robbery, Williams went to the police station where he spoke with Sgt. Johnson and viewed photo lineups.  From one lineup, he identified Adams as the first assailant who had held a gun to his side.  He was unable to identify the second person because he had remained behind Williams the entire time.  On cross-examination, Williams stated that Appellant did not "look like the guy that got in the back seat of the car."  He said that Appellant's brother, Kenard Smith, looked like the second male that had been sitting in the white car.

On January 26, 2006, Appellant spoke with Sgt. Johnson and made a voluntary written statement.  In the statement, Appellant said that he and Adams wanted some heroin so they went to the Family Dollar Store to "hit a lick."  Adams was armed with a .44 caliber and Appellant had a TEC 9.  They followed a guy to the store with the intention of taking him in his car, going around the corner and robbing him, and then throwing his keys in the field.  As they got out of the car, however, they changed their minds and were getting back into their car when Adams' gun discharged.  Adams slumped down and said, "Cuz I'm shot, I shot myself."  Appellant drove Adams to a hospital and dropped him off at the emergency room.  The next day, Appellant learned that Adams had died.  He went to see Adams' mother and told her what had happened.

Appellant presented two witnesses in his defense-Marilu Webster and Willie Faggett.  Webster, a store employee, was working on the evening of December 28, 2005.  She recalled a man coming into the store saying he had been robbed.  She called 9-1-1 and handed the phone to the store manager.  Webster thought it was unusual that the victim said he did not have time to wait for the police.  She also remembered the man saying, "they were trying to get him, but he got to them first."  She understood this to mean that he had shot the other person.

3

>       Faggett owns a business next door to the Family Dollar Store. Around 7:30 p.m. on December 28, 2005, he saw a Suburban and another vehicle pull into the parking lot and block each other while gunfire was exchanged. Faggett believed ten to twelve shots were fired. The person in the Suburban had been shot and was bleeding. No one got out of either vehicle and the Suburban left before the police arrived.
>
>       The trial court's charged [sic] included an instruction on the law of parties. The jury rejected Appellant's defense and found him guilty of aggravated robbery as alleged in the indictment.

*Id.* at 123-27, ECF No. 16-1.

At the punishment phase of his trial, Petitioner pleaded true to the repeat-offender notice, and the jury assessed his punishment at 50 years' confinement. *Id.* The appellate court affirmed the trial court's judgment, and the Texas Court of Criminal Appeals refused Petitioner's petition for discretionary review. *Id.* at 133, ECF No. 16-1. Petitioner also filed two state habeas applications challenging his conviction and sentence. The first was denied by the Texas Court of Criminal Appeals without written order on the findings of the trial court, and the second was dismissed as successive. *Id.* at cover, ECF No. 16-1; WR-79-775-02 writ, at cover, ECF No. 16-5. This petition for federal habeas relief followed.

## II. ISSUES

In four grounds, Petitioner claims he received ineffective assistance of counsel (grounds one and three), his written "statement does not contain the needed waiver" of his rights "on its face (ground two)," and the trial court should have given a jury instruction on the voluntariness of his statement (ground four). Pet. 6-7, ECF No. 1.

## III. RULE 5 STATEMENT

Respondent does not assert that the petition is barred by lack of exhaustion, the statute of

4

limitations, or successiveness. Resp't's Ans. 8, ECF No. 18.

## IV. DISCUSSION

### A. Legal Standard for Granting Habeas-Corpus Relief

A § 2254 habeas petition is governed by the heightened standard of review provided for in the Anti-Terrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C. § 2254. Under the Act, a writ of habeas corpus should be granted only if a state court arrives at a decision that is contrary to or an unreasonable application of clearly established federal law as established by the Supreme Court or that is based on an unreasonable determination of the facts in light of the record before the state court. *Id.* § 2254(d)(1)–(2); *Harrington v. Richter,* 562 U.S. 86, 100 (2011). This standard is difficult to meet and "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Harrington*, 562 U.S. at 102.

Additionally, the statute requires that federal courts give great deference to a state court's factual findings. *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct. A petitioner has the burden of rebutting the presumption of correctness by clear-and-convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *Williams v. Taylor*, 529 U.S. 362, 399 (2000).

Finally, when the Texas Court of Criminal Appeals denies relief in a state habeas-corpus application without written order, as in this case, it is an adjudication on the merits, which is also entitled to the presumption of correctness. *Singleton v. Johnson*, 178 F.3d 381, 384 (5th Cir. 1999); *Ex parte Torres*, 943 S.W.2d 469, 472 (Tex. Crim. App. 1997). Under these circumstances, a federal court may assume the state court applied correct standards of federal law to the facts, unless there

is evidence that an incorrect standard was applied. *Townsend v. Sain,* 372 U.S. 293, 314 (1963)[1]; *Catalan v. Cockrell,* 315 F.3d 491, 493 n.3 (5th Cir. 2002); *Valdez v. Cockrell,* 274 F.3d 941, 948 n.11 (5th Cir. 2001); *Goodwin v. Johnson,* 132 F.3d 162, 183 (5th Cir. 1997).

### B. Ineffective Assistance of Counsel

A criminal defendant has a constitutional right to the effective assistance of counsel at trial. U.S. Const. amend. VI, XIV; *Strickland v. Washington*, 466 U.S. 668, 688 (1984). To establish ineffective assistance of counsel a petitioner must show (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that but for counsel's deficient performance the result of the proceeding would have been different. *Strickland*, 466 U.S. at 688. Both prongs of the *Strickland* test must be met to demonstrate ineffective assistance. *Id.* at 687, 697. In applying this standard, a court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance or sound trial strategy. *Id*. at 668, 688-89. Judicial scrutiny of counsel's performance must be highly deferential and every effort must be made to eliminate the distorting effects of hindsight. *Id.* at 689. The Supreme Court recently emphasized in *Harrington v. Richter* the manner in which a federal court is to consider an ineffective-assistance-of-counsel claim raised in a habeas petition subject to AEDPA's strictures:

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." A state court must be granted a

---

[1] The standards of *Townsend v. Sain* have been incorporated into 28 U.S.C. § 2254(d). *Harris v. Oliver*, 645 F.2d 327, 330 n.2 (5th Cir. 1981).

6

> deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

562 U.S. at 101 (quoting *Williams,* 529 U.S. at 410 (emphasis in original)). Accordingly, it is necessary only to determine whether the state courts' adjudication of petitioner's ineffective-assistance claims was contrary to or an objectively unreasonable application of *Strickland. Bell v. Cone,* 535 U.S. 685, 698-99 (2002); *Kittelson v. Dretke,* 426 F.3d 306, 315-17 (5th Cir. 2005); *Schaetzle v. Cockrell,* 343 F.3d 440, 443 (5th Cir. 2003).

Petitioner was represented at trial by Lesa Pamplin, as lead counsel, and Michelle Audet. Petitioner claims counsel were ineffective by abandoning a motion to suppress his written statement (ground one) and by failing to consult with him about the plea offer and request a competency evaluation when he told counsel "he did not understand what was going on in the plea hearing" (ground three). Pet. 6-7, ECF No. 1.

Respondent contends Petitioner's ground three, raised for the first time in Petitioner's second state habeas application, which was dismissed by the Texas Court of Criminal Appeals as successive, is procedurally barred. On habeas corpus review, a federal court "will not consider a claim that the last state court rejected on the basis of an adequate and independent state procedural ground." *Busby v. Dretke,* 359 F.3d 708, 718 (5th Cir. 2004) (citing *Coleman v. Thompson,* 501 U.S. 722, 729-30 (1991)). The procedural bar will not be considered adequate unless it is applied regularly or strictly to the great majority of similar claims. *Amos v. Scott,* 61 F.3d 333, 338 (5th Cir.), *cert. denied,* 516 U.S. 1005 (1995). Petitioner's second state habeas application, wherein he first raised his third ground, was dismissed as a subsequent application pursuant to article 11.07, § 4 of the Texas Code of Criminal Procedure. TEX. CODE CRIM. PROC. art. 11.-07, § 4 (West 2015). The Texas Court of

7

Criminal Appeals applies its abuse of the writ doctrine regularly and strictly. *Fearance v. Scott,* 56 F.3d 633, 642 (5th Cir.), *cert. denied,* 515 U.S. 1153 (1995). Accordingly, the Texas abuse-of-the-writ statute is a valid state-law procedural ground that forecloses federal habeas review where, as here, there is no indication that the state court relied on federal law in dismissing Petitioner second state habeas application.

A habeas petitioner can overcome a procedural default by showing cause and actual prejudice or a miscarriage of justice. *See Murray v. Carrier,* 477 U.S. 478, 488 (1986). To show cause for a procedural default, a petitioner must demonstrate the existence of an objective external factor that caused the default. *Id.* To show a miscarriage of justice, the petitioner must demonstrate that a constitutional violation probably resulted in the conviction of one who is actually innocent of the crime. *See Rodriguez v. Johnson,* 104 F.3d 694, 697 (5th Cir. 1997). Petitioner has failed to demonstrate either cause, prejudice or a miscarriage of justice related to his ineffective-assistance claim presented in his second state application. Therefore, Petitioner is not entitled to federal habeas corpus relief on his third ground raised for the first time in his second state application, and the claim is procedurally barred. Consequently, the discussion below applies only to Petitioner's first ground which was presented in his first state application and addressed on the merits by the Texas Court of Criminal Appeals.

In his first ground, Petitioner claims counsel was ineffective by abandoning the defense that his written statement was not voluntarily given. The record reflects counsel did file a motion to suppress Petitioner's statement before trial but withdrew the motion on the date trial commenced without explanation. Clerk's R. 19-20, ECF No. 12-6; RR, vol. 4, at 7, ECF No. 13-1.

The state habeas judge conducted a hearing by affidavit, wherein Pamplin testified, in

relevant part, as follows:

## INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

Mr. Smith challenges the voluntariness of his confession . . . . Pursuant to Article 38.22 Tex. Code Crim. Procedure, no written statement made by an accused as a result of custodial interrogation is admissible as evidence against him in any criminal proceeding unless it is shown on the face of the statement that: (a) the accused, prior to making the statement, either received from a magistrate the warning provided in Article 15.17 of the code, or received from the person to whom the statement is made a warning that:

(1) He has the right to remain silent and not make any statements at all, and that any statements he makes may be used against him at trial;
(2) Any statement he makes may be used as evidence against him in court;
(3) He has the right to have a lawyer present to advise him prior to and during any questioning;
(4) If he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and
(5) He has the right to terminate the interview at any time.

The voluntariness of the confession was never an issue in this trial. Detective Johnson testified that she left her business card on every address that she had for Devondric and Kenard Smith. After leaving a message on Smith's cell phone, Smith drove himself to 350 Belknap to meet with Detective Johnson. Detective Johnson testified that Smith did not have an appointment and waited until she returned from the field. Prior to speaking with Smith, Detective Johnson took Smith's driver's license and photocopied it. Detective Johnson informed Smith that the focus of her investigation was on the shooting of James Adams. Additionally, she informed him that her focus was not on the robbery, but rather whether Adams was killed accidentally or whether he was murdered.

Mr. Smith voluntarily went down and gave a statement to the police and was free to leave after finishing his statement. The Fort Worth Police Department used a form titled "Voluntary Statement". Beronica Bribiesca, Detective Johnson's secretary, failed to edit the name Troy Paul Clark from the space where Smith's name should have gone. When the State attempted to introduce the statement into evidence, Michele Audet objected to the admissibility of the statement and asked Judge Young for permission to take the witness on voir dire. Through a series of questions, Michele Audet elicited from Detective Johnson that the four corners of the document contained the name Troy Paul Clark and should not be published in front of the jury. Judge Young overruled the objection and the statement was admitted. The next

paragraph clearly identified Smith by his full name, date of birth and home address. The voluntary statement that Smith made was not the product of a custodial interrogation. Smith was allowed to leave and was arrested for Aggravated Robbery after a warrant for [sic] issued on March 15, 2006.

On July 12, 2006, I received a letter from Mr. Smith wherein he advised me that he was interviewed by police about a murder. In the correspondence, Mr. Smith admits that he signed a statement "that might have put me at the crime of Aggravated Robbery". Mr. Smith made a voluntary statement he thought was absolving him of the murder of James Adams, not realizing he was implicating himself as a party in the Aggravated Robbery.

Strategically, counsel did not move to suppress Mr. Smith's statement. There were two instances where Smith admitted to being present. Smith placed himself at the scene of the robbery with his oral statements to Ms. Adams and his written statement to Detective Johnson. Instead, counsel focused on an alternative theory that complainant was not robbed, but was involved in a shootout with others. Counsel challenged the complainant who was unable to identify Smith when presented with police photo lineups. On cross examination of the complainant he stated that Smith did not "look like the guy that got in the back seat of the car." He stated that Smith's brother, Kenard Smith, looked like the second male that was at the scene. Additionally at trial, complainant explained that he left before police arrived because he was on felony probation for possession of a controlled substance and did not want to talk with the police.

Counsel presented two witnesses to shore up the theory that the complainant was not believable and had something to hide. Counsels' theory was that complainant was involved in a shootout with some other individuals. Marilu Webster testified that the complainant was acting strange because he didn't have time to wait for the police. She testified that the complainant stated "they were trying to get him, but he got them first." Willie Faggett testified that he observed the complainant pull into the parking lot followed by another vehicle. He testified that he heard ten to twelve shots exchanged between the two vehicles. This testimony was inconsistent with what the complainant said. Faggett also testified that the complainant left before the police arrived.

### JURY INSTRUCTION

Smith alleges that he was entitled to a jury instruction on the voluntariness of his confession. As previously stated, Smith freely and voluntarily provided a written statement to Detective C.D. Johnson. The statutory warnings were not on the front of the statement as Smith was not in custody at the time the statement was given. From his letter to counsel, it is clear that Smith knew that this voluntary statement

could pose a problem as he requested in his letter that I try to "sqush" it."

. . .

WR-79-775-01 writ, 34-37, ECF No. 16-1 (citations to the record omitted).

Audet also testified via affidavit, in relevant part, as follows:

> 7.   **A hearing on the Motion to Suppress was deemed not necessary as part of "strategic design".** The Defendant's statement was voluntary and not the result of custodial interrogation; this was discussed with the defendant on multiple occasions. The statement did contain a typographical error of which was subject of an objection to which the Judge overruled and admitted into evidence. Defendant was involved with all discussions regarding the statement and approved of counsels' trial strategy.
>
> . . .
>
> 9.   The Defendant voluntarily presented himself to the police station and thru his own admission gave a voluntary statement. **No evidence existed in this case nor the trial record to allow counsel to request a jury instruction on the voluntariness of the statement.**
>
> . . .

*Id.* at 78-79 (citations to the record omitted) (emphasis in original).

The state habeas judge, who also presided at trial, found counsel's affidavits credible on the issue and entered factual findings that Petitioner was not in custody at the time he made the written statement and that counsel reviewed the facts and circumstances surrounding the statement, explained the law and their conclusion to Petitioner on multiple occasions, and chose not to challenge the statement because it was not made as a product of custodial interrogation. *Id.* 88-89, 95. Based on its findings, and applying the *Strickland* standard, the state court concluded that counsel made reasonable decisions regarding the voluntariness of Petitioner's written statement and that Petitioner had failed to show that, but for counsel's acts or omissions, there is a reasonable

11

probability that the outcome of his trial would have been different. *Id.* at 94. The court's findings were later adopted by the Texas Court of Criminal Appeals. *Id.* at cover.

To the extent Petitioner asserts the statement was not admissible under article 38.23 of the Texas Code of Criminal Procedure, his claim provides no basis for federal habeas relief. *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991). Further, absent clear and convincing evidence in rebuttal, this Court defers to the state court's factual findings. The state court deduced that counsel withdrew the motion because counsel believed the motion was baseless. Petitioner has not shown that the motion was itself meritorious or that withdrawing it was not strategically advisable. As such, the state courts' application of *Strickland* was reasonable. Counsel is not required to pursue frivolous or futile motions. *Sones v. Hargett,* 61 F.3d 410, 415 (5th Cir. 1995); *Murray v. Maggio,* 736 F.2d 279, 283 (5th Cir. 1984). Furthermore, strategic decisions made by counsel after thorough investigation of law and facts are virtually unchallengeable on federal habeas review. *Strickland,* 466 U.S. at 689.

### C. Trial Court Error

Under his second ground, Petitioner claims the trial court erred in admitting his written statement because it did not contain "the needed waiver of Petitioner's rights 'on its face,'" in light of the fact that there is another person's name on the statement. Pet. 6, ECF No. 1. In addition to finding that Petitioner's statement was voluntary and admissible because it was not a product of custodial interrogation, the state habeas court found that "[t]he trial court [properly] admitted the statement because the sponsoring testimony and the statement's remaining portions clearly identified the applicant as its maker." Adm. R., WR-79-775-01 writ, 95, ECF No. 16-1.

A state court's evidentiary ruling does not present a cognizable habeas claim unless it violates a specific constitutional right or renders the petitioner's trial fundamentally unfair. *Johnson v.*

*Puckett,* 176 F.3d 809, 820 (5th Cir. 1999). The Fifth Amendment's protection against compelled self-incrimination applies to the states through the Fourteenth Amendment's Due Process Clause. *Malloy v. Hogan,* 378 U.S. 1, 6 (1964). Because *Miranda* warnings protect an individual against the coercive nature of custodial interrogation, they are required only where there has been such a restriction on a person's freedom as to render him in custody. "Custodial interrogation" within the meaning of *Miranda* requires two discrete inquiries: (1) what were the circumstances surrounding the interrogation; and (2) given those circumstances, would a reasonable person have felt he was at liberty to terminate the interrogation and leave. *Thompson v. Keohane,* 516 U.S. 99, 112 (1995). The ultimate question is whether a reasonable person would feel free to leave under the totality of the circumstances, that is, "whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler,* 463 U.S. 1121, 1125 (1983).

In this case, there is no indication that Petitioner's freedom was restricted in any way. He came voluntarily to the police station, he was not under arrest, and, at the close of the interview, Petitioner did in fact leave the police station without hindrance. RR, vol. 5, at 98-102, ECF No. 14-1. Accordingly, the state courts' determination that Petitioner's statement was not custodial in nature, and thus admissible, comports with Supreme Court precedent on the issue. *See Oregon v. Mathianson,* 429 U.S. 492, 495 (1977).

Finally, under his fourth ground, Petitioner claims the trial court erred by failing to give instructions to the jury regarding the voluntariness of his written statement. Pet. 7, ECF No. 1. Given the discussion above, and as concluded by the state habeas court, this claim necessarily fails because there was no evidence that Petitioner's statement was involuntary or the product of custodial interrogation. Adm. R., WR-79-775-01 writ, 98, ECF No. 16-1.

13

## V. CONCLUSION

For the reasons discussed herein, Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is **DENIED**. Further, pursuant to 28 U.S.C. § 2253(c), for the reasons discussed herein, a certificate of appealability is **DENIED**.

**SO ORDERED** on this 8th day of July, 2015.

_____
Reed O'Connor
**UNITED STATES DISTRICT JUDGE**